Reverend David L. NEHRING, Margo M. Brower, Dennis Donavon and Margaret Pitts, Individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

George R. ARIYOSHI, Individually and in his capacity as the Governor, State of Hawaii, Defendant.

Civ. No. 77–0276.

United States District Court, D. Hawaii.

Dec. 16, 1977.

Robert Gilbert Johnston, Clayton C. Ikei, Honolulu, Hawaii, for plaintiffs.

Lawrence D. Kumabe, Glenn S. Hara, Deputy Attys. Gen., Ronald Y. Amemiya, Atty. Gen., State of Hawaii, Honolulu, Hawaii, for defendant.

## DECISION ON MOTIONS TO ABSTAIN AND FOR PRELIMINARY INJUNCTION

SAMUEL P. KING, Chief Judge.

### I.

### FACTUAL BACKGROUND

A. *History of the Residency Requirement.*

Mark Twain once described the Hawaiian islands as "the loveliest fleet of islands that lies anchored in any ocean. . . ."[1] This feeling has certainly been shared by large numbers of people from every racial, ethnic, and cultural background. For over a thousand years people have been travelling to Hawaii, and they have stayed here in ever-increasing numbers. As with almost all good things which are not in limitless supply in this world, many of the "haves" do not particularly wish to share their good fortune with the "have-nots."

1. Letter from Samuel Clemens to H. P. Wood (Nov. 30, 1908), *reprinted in* W. F. Frear, Mark Twain and Hawaii 242–43 (1947).

In order to dissuade people from continuing to settle in Hawaii, several years ago the legislature enacted a durational residency requirement for public employment.[2] This law provided that with certain exceptions no one could be employed by the State or any county or municipal subdivision of the State without having been a resident of Hawaii for three years immediately preceding his or her appointment. In 1972, the Hawaii Supreme Court declared that this statute created a classification which was not supported by any rational basis.[3] It therefore held that the statute violated the Equal Protection Clause of the Constitution. *York v. State,* 53 Haw. 557, 498 P.2d 644 (1972). The enforcement of the statute was enjoined and there matters rested until early this year.

In January of 1977, defendant Ariyoshi, the Governor of Hawaii, expressed his willingness to "put this State in direct confrontation with the present laws of this land and possibly even the Constitution of the United States."[4] He called for "bold . . ideas and action" to combat the problem of potential overpopulation in Hawaii. In response, the Legislature enacted a new, one-year durational residency requirement for public employment. Although no survey was ever made to ascertain the number of public employees who were residents of the state for less than a year, the Governor signed the law and it became effective on June 21, 1977.

The new version of Hawaii Revised Statutes section 78-1 provides in part:

> (b) All employees in the service of the government of the State or in the service of any county or municipal subdivision of the State shall be citizens, nationals or permanent resident aliens of the United States and residents of the State for at least one

year immediately preceding their application for employment. . . .

. . . . .

> (f) The requirement of residency, as defined under subsection (b) . . shall not apply to persons recruited by the University of Hawaii under the authority of Chapter 304-11; provided, however, that all persons recruited as Administrative/Professional/Technical personnel of the University of Hawaii shall be subject to the requirement of residency; provided further that appointment of persons to positions requiring highly specialized technical and scientific skills and knowledge may be made without consideration of residency.

Act 211, 1977 Haw.Sess.Laws. The state immediately began to enforce this new statute.

B. *The Named Plaintiffs.*

This action was brought by four individual plaintiffs. In December, 1976, plaintiff David L. Nehring moved from Connecticut to Hawaii because his wife accepted employment heading up the nursing program at the University of Hawaii, Hilo. Reverend Nehring had never been to Hawaii before this time. In July, 1977, he applied for a job as a resident dorm manager at the Hilo campus of the University of Hawaii. Although before the residency law had been enacted, university authorities had encouraged Reverend Nehring to apply for this job, he was told that no interview would be forthcoming because he had not been a resident of Hawaii for more than a year.

Plaintiff Margo M. Brower arrived in Hawaii on June 2, 1977, after travelling from New York with her husband. Ms. Brower is trained as a teacher of English as a

---

2. Haw.Rev.Stat. § 78-1(a) (1968) (current version § 78-1, Act 211, 1977 Haw.Sess.Laws).

3. The State sought to justify the statute on the grounds that it insured that all employees would possess the requisite qualifications for their job. *York v. State,* 53 Haw. 557, 559-60 & n. 3, 498 P.2d 644, 646-47 & n. 3 (1972). See also note 24, *infra.* In the instant case, the

State has offered new and different justifications for the statute. Therefore, *York v. State* is not exactly on point with the case before me.

4. State-of-the-State Address by Governor George R. Ariyoshi, Ninth State Legislature Meeting in Joint Session (Jan. 25, 1977) (defendant's Exhibit No. 3).

second language. She applied for jobs at all of the community colleges on Oahu. David Luke, the Assistant Personnel Director at the University of Hawaii, informed her that she could not qualify for an interview because of her residency status.

Plaintiff Dennis Donavon came to Hawaii for the first time in early 1977. He sought employment and was eventually hired as a vending facility specialist by Hoopono, the State agency for the blind. He began work on April 26, 1977, but was terminated on July 15, 1977. His supervisor informed him that his termination was due to the recent enactment of the durational residency statute. Hoopono has continued to accept Mr. Donavon's services as an unpaid volunteer.

Plaintiff Margaret Pitts came to Hawaii with her two children on August 1, 1976. Ms. Pitts is trained as a social worker and eventually obtained a job with the Child Protective Services Unit of the State Department of Social Services. She worked from May 26, 1977, until June 24, 1977, when her employment was terminated. As with Mr. Donavon, Ms. Pitts was informed by her supervisor that she was fired because of her residency status. Immediately upon her becoming a resident for a year (August 2, 1977), she was rehired for the same job.[5]

On August 1, 1977, these four individual plaintiffs filed a complaint under 42 U.S.C. § 1983 naming the Governor of Hawaii as the sole defendant. Representing the class of all residents of Hawaii who had not resided in the State for more than one year prior to the enactment of the residency requirement,[6] the plaintiffs challenged the statute as violative of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments.[7] They simultaneously moved for a preliminary injunction restraining the defendant from enforcing the durational residency requirement for public employment. The defendant filed a counter-motion requesting that this Court abstain from decision so that the plaintiffs could pursue their claims in state court. Both motions were heard by the Court on August 25, 1977. For the reasons set forth below, I am of the opinion that the motion to abstain should be denied and that the preliminary injunction should issue.

## II.

### THE MOTION TO ABSTAIN

■ The defendant asks that this Court defer to the state courts of Hawaii so that they will have the first opportunity to hear and decide the constitutional validity of the durational residency requirement. The defendant suggests that either of two forms of abstention would be appropriate in this case. These two types of abstention are commonly denominated as *Pullman* abstention and *Burford* abstention.

### A. *Pullman Abstention.*

The *Pullman* doctrine requires a federal court to consider abstaining from decision in order to avoid unnecessary conflict with state policies whenever a federal constitutional issue may be avoided or presented in a different posture by a state court determination of an issue of relevant state law. *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Harrison v. N.A.A.C.P.*, 360 U.S. 167, 176–77, 79

---

5. Thus, between the time the complaint was filed and the time of this hearing, Ms. Pitts' claim for injunctive relief had become moot. She will therefore be dropped from the class. She may, of course, still have a damages action against the State or certain individuals. Due to the Eleventh Amendment, any monetary claim against the State must be brought in state court. *See Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In any event, the complaint in this case did not contain a prayer for damages.

6. The class was later certified to include:
   those persons who have been denied State public employment, continued employment, or reemployment as a result of the one-year durational aspect of the residency requirement contained in paragraph b, Section 78–1, Hawaii Revised Statutes, as amended by Act 211, Session Laws of Hawaii 1977.
   Order of September 20, 1977.

7. Inasmuch as this case involved actions solely performed by the State or its officials, only the Fourteenth Amendment need be considered.

S.Ct. 1025, 3 L.Ed.2d 1152 (1959). *See generally* P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 988–94 (2d ed. 1973) [hereinafter cited as Hart & Wechsler]; C. Wright, Law of Federal Courts § 52, at 218–21 (3d ed. 1976). The Court has made it clear that *Pullman* abstention should only be invoked in "special circumstances." *Harris County Comm'rs v. Moore*, 420 U.S. 77, 83, 95 S.Ct. 870, 43 L.Ed.2d 32 (1975). Abstention is the exception to the general rule that a court must decide any case or controversy properly presented to it. Only if the state statute is "fairly susceptible" to a construction which avoids or limits the constitutional question is abstention appropriate. *Kusper v. Pontikes*, 414 U.S. 51, 55, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973); *Zwickler v. Koota*, 389 U.S. 241, 251 n. 14, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967) (obviously susceptible). *See also Carey v. Sugar*, 425 U.S. 73, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976); *Boehning v. Indiana Employees Ass'n*, 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975); *Steffel v. Thompson*, 415 U.S. 452, 475 n. 22, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).

In this case, it is helpful to consider two different factual situations which may call for abstention. First, a state statute may be ambiguous, with one possible construction of the statute avoiding or substantially limiting the federal constitutional question. Alternatively, a clear statute may possibly violate an unconstrued state constitutional provision. If the state constitutional provision nullifies the statute, there is no need to reach the federal question.

Turning to the first problem, the defendant argues that three things are unclear in the challenged statute: the term "residents," the phrase "all employees," and the exception in subsection (f) of the statute for certain persons recruited by the University of Hawaii. The defendant reasons that the term "residents" is ambiguous since it is not actually defined within the statute. The term is not ambiguous, however, just because someone says it is so. The defendant has never offered any reasonable definition of the word which would include the plain-

tiffs within the group of state residents entitled to seek public employment. For example, plaintiff Donavon came to Hawaii from Wisconsin six months prior to the hearing on the Motion to Abstain. He had never before been to Hawaii. I can think of no conceivable definition of residency which would make him a "resident" of the state for at least a year. Furthermore, another state durational residency requirement uses the words "domiciled or has been physically present in the State for a continuous period of at least one year . . . ." Haw.Rev.Stat. § 580–1 (Supp.1975) (residency requirement for divorce decree). That is certainly the traditional meaning of the term. I conclude that the term "residents" is not fairly susceptible to any construction which would avoid excluding the plaintiffs from state employment on the basis of their recent interstate travel.

Similarly, although the defendant alleges that the term "employees" is unclear, he offers no interpretation of that term which would exclude the plaintiffs here. He refers to two of the named plaintiffs who were hired on an emergency 30-day basis, and raises questions as to whether they had a protected "expectation" of continued employment. But these questions refer to procedural due process and the right to notice and a hearing before termination of employment, *see, e. g., Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Bd. of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), not to a violation of equal protection such as the one alleged here. *Cf. Nelson v. Southeastern Pa. Transp. Auth.*, 420 F.Supp. 1374 (E.D.Pa.1976) (abstention ordered in a Due Process case since the existence of a protectable "property" interest in employment is determined by state law). Again, I think of no reasonable definition of "employees" which would exclude the salaried workers who are plaintiffs here.

The defendant's argument concerning the ambiguity of the university exception does have some merit. Perhaps the state courts will be required to delineate just which jobs fall in the category of "Administrative/Pro-

fessional/Technical" employment or are those "requiring highly specialized technical and scientific skills and knowledge . .." [8] Nevertheless, no matter how broadly or narrowly those terms are defined, there will still be persons such as plaintiff Donavon who have no connection whatsoever with the university. Those people seek to vindicate the *same* constitutional claim as do the university applicants: the right to apply for a job regardless of their recent exercise of the right to travel interstate. This claim is wholly unrelated to the kind of job which each person seeks.

The defendant also raises the possibility that the durational residency statute may violate a number of state constitutional provisions, including Article I, section 2 (all persons are free and equal),[9] Article I, section 4 (a state due process and equal protection clause),[10] and Article I, section 6 (no one should be deprived of rights secured for others, unless by law) [11] of the Hawaii State Constitution. The defendant argues that the state courts might interpret these provisions so as to nullify the challenged statute. Relying on *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970), he suggests that this Court abstain while the state courts resolve those issues.

In *Reetz,* the Supreme Court faced a federal equal protection challenge by non-residents to an Alaskan statute limiting the issuance of commercial licenses for net salmon fishing to those who had previously held such a license or to those who had engaged in commercial fishing for the past three years. The plaintiffs also attacked the statute as invalid under the Alaskan Constitution which provided that:

Wherever occurring in their natural state, fish, wildlife, and waters are reserved to the people for common use.

Alas.Const. art. VIII, section 3 (1973). The state constitution further provided that:

No exclusive right or special privilege of fishery shall be created or authorized in the natural waters of the State.

Alas.Const. art. VIII, section 15 (1959) (amended 1972). A three-judge court had held that the statute violated both the federal and state constitutions. The Supreme Court vacated this judgment, holding that the federal court should have abstained so that the Alaskan courts could consider the statute in the first instance in the light of these specific state constitutional provisions. The Court ordered abstention because "the nub of the whole controversy may be the state constitution." 397 U.S. 87, 90 S.Ct. 790. In the instant case, the defendant argues that *Reetz* compels this court to abstain so that the state judiciary may have the opportunity to consider the effect of the state constitution on the new durational residency statute.

The *Reetz* decision, however, is not the Court's last word on the subject of deference to state constitutional construction. The Court has continued to struggle with the question of when abstention is or is not appropriate and *Reetz,* where the Court deferred to a very specific state constitutional provision which had no federal counterpart, merely represents the best example of a case where abstention is desirable. On the other hand, in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the Court faced a statute allowing a state official to post a person's name on public lists forbidding the sale of alcohol to

**8.** Haw.Rev.Stat. § 78–1(f), Act 211, 1977 Haw. Sess.Laws, *quoted in* Part I, *supra.*

**9.** Haw.Const., art. I, § 2 (1968) provides:

All persons are free by nature and are equal in their inherent and inalienable rights. Among these rights are the enjoyment of life, liberty and the pursuit of happiness, and the acquiring and possessing of property. These rights cannot endure unless the people recognize their corresponding obligations and responsibilities.

**10.** Haw.Const., art. I, § 4 (1968) provides:

No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of his civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

**11.** Haw.Const., art. I, § 6 (1968) provides:

No citizen shall be disfranchised or deprived of any of the rights or privileges secured to other citizens, unless by the law of the land.

listed persons without previous notice or a hearing. The Court held that this practice violated the Due Process Clause of the Fourteenth Amendment, and it specifically ruled that abstention was not necessary, despite the dissent's claim that the federal courts should require the parties to obtain a state court ruling on the effect of the statute in the light of the state constitution's due process clause. *Compare Wisconsin v. Constantineau, supra* at 437–39, 91 S.Ct. 507, *with id.* at 439–43, 91 S.Ct. 507 (Burger, C. J., dissenting). The Court later explained the difference between the *Reetz* and the *Constantineau* cases:

> In [*Constantineau*], we declined to order abstention where the federal due process claim was not complicated by an unresolved state-law question, even though the plaintiffs might have sought relief under a similar provision of the state constitution. But where the challenged statute is part of an integrated scheme of related constitutional provisions, statutes, and regulations, and where the scheme as a whole calls for clarifying interpretation by the state courts, we have regularly required the district court to abstain. (citing *Reetz*)
>
> . . . . .

*Harris County Comm'rs Court v. Moore,* 420 U.S. 77, 84–85 n. 8, 95 S.Ct. 870, 876, 43 L.Ed.2d 32 (1975).

The next case in which the Court faced state constitutional construction arose within months of the *Constantineau* decision. *Askew v. Hargrave,* 401 U.S. 476, 91 S.Ct. 856, 28 L.Ed.2d 196 (1971), involved an injunction issued by a three-judge court on federal equal protection grounds against Florida's public school financing program. Subsequent to the filing of the federal suit, a similar challenge was launched in state court. This latter suit primarily attacked the school financing program on state constitutional grounds. The *Hargrave* opinion is unclear as to whether the state constitu-

tional issues asserted in the state case were the equivalent of the federal equal protection question (a "mirror" issue) or whether there were more unique state claims raised. In any case, the Court remanded the case for reconsideration of the abstention question in the light of *Reetz.* As Judge Choy noted in *Stephens v. Tielisch,* 502 F.2d 1360, 1361 (9th Cir. 1974), "it does seem likely that there were non-mirror state issues in the case, for otherwise it certainly would have been appropriate for the Court to have discussed *Constantineau,* decided earlier in the term." [12]

The Court seems to have set up a dichotomy, albeit an unarticulated one, based upon the nature of the state constitutional issue which could be raised. If the state claim is merely the local equivalent of an important federal right then abstention is unnecessary. On the other hand, if the state claim extends to an interest primarily protected by the individual state's authority, particularly in a case involving a complex statutory and constitutional scheme, a federal court should allow the state courts to resolve the case in the first instance. *See generally* Hart & Wechsler 992–94.

The Court followed this pattern in the latest case dealing with abstention and state constitutional claims. In *Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976), the plaintiffs had challenged a Puerto Rican statute prohibiting the licensing of aliens as private civil engineers. The Court refused to order abstention so that the Puerto Rican courts could consider the statute in the light of the Commonwealth's equal protection clause and constitutional provision forbidding discrimination on the basis of "race, color, sex, birth, social origin or condition, or political or religious ideas." The Court explained that requiring abstention "because [the statute] might conflict with the cited broad

---

12. If there were no non-mirror issues in *Hargrave,* then perhaps the case can be distinguished from *Constantineau* on the basis of the existence of a contemporaneous state suit raising identical state issues. In the interest of

federal-state comity, a federal court might abstain in order to give a state court the first chance to resolve the problem. In the case at bar, no state suit has been filed and, thus, I cannot consider abstention on this basis.

and sweeping constitutional provisions, would convert abstention from an exception into a general rule." 426 U.S. 598, 96 S.Ct. 2279. No interest unique to the Puerto Rican constitution was raised in *Flores de Otero* and, hence, there was no special reason to give the commonwealth's courts the first opportunity to construe the statute in the light of an important interest which is normally protected by the federal government.

The defendant's request for *Pullman*-type abstention in favor of state court constitutional construction must be considered against this background. The state constitutional questions raised are sweeping and broad, and they do not implicate interests which have been traditionally left to the states in our federal system. Indeed, ever since the Civil War and the enactment of the Fourteenth Amendment, issues such as non-discrimination and equal opportunity have been a major federal concern.

The facts in the instant case are most closely related to the situation in *Flores de Otero,* and on the authority of that case I will deny the motion to abstain for reasons based upon *Pullman* doctrine.

### B. *Burford Abstention.*

The defendant also asserts that the durational residency requirement is part of a large, complex regulatory scheme designed to enhance Hawaii's unique environment and to protect its economy. He suggests that abstention is thus appropriate under the line of cases which began with *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). In *Burford,* the plaintiff brought an action in federal court based upon both diversity and federal question jurisdiction. The plaintiff attacked the validity of a proration order issued by a state commission which regulated drilling in a Texas oil field. The Court noted that the order was part of a complex regulatory

scheme under state law. The state had provided a comprehensive judicial appeals system which focused all appeals in the courts of a single county in order to prevent the confusion which would result from collateral appeals of the single commission's decisions. 319 U.S. 326, 63 S.Ct. 1098. The Court felt that this issue of collateral appeals was so important that a federal court should refuse to entertain any action involving an appeal from the commission's decision. Therefore, the complaint was dismissed.

Similarly, in *Alabama Public Service Comm'n v. Southern Ry. Co.,* 341 U.S. 341, 71 S.Ct. 762, 95 L.Ed. 1002 (1951), a railroad sought to challenge a state administrative order denying a permit to discontinue a particular intrastate train service. Again, as "an integral part of the regulatory process," the state provided for appeals concentrated in one particular court. 341 U.S. 348, 71 S.Ct. 767. To avoid friction with the state, the federal court was required to abstain.

The *Burford* line of cases is not apposite here. *Burford*-type cases involve actions where for any number of reasons[13] the exercise of federal review itself transcends the importance of the decision from which an appeal is taken. *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814–15, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). In the instant case, the intervention of the federal courts does not transcend the issue to be decided in this action. Assuming that the durational residency statute is a part of the State's environmental and economic growth plan,[14] it is not so interrelated with those goals as to preclude federal review. The case does not involve an individual claim which will disrupt an appeals system by creating confusion through inconsistent collateral attacks. Rather, in this class action the validity of the durational residency statute will be determined once and for all. I do not find

---

**13.** For example, in *Burford* and *Alabama Public Service Comm'n,* the disruption caused by collateral appeals is more important than the decision to permit certain oil drilling or provide train service on one particular line.

**14.** See Part IIIB, *infra.*

that *Burford*-type abstention would be at all appropriate in this case.

III.

THE EFFECT OF THE EQUAL
PROTECTION CLAUSE

The plaintiffs argue that the durational residency statute violates the Equal Protection Clause because it creates two separate classes of bona fide residents of the state and unjustifiably treats these two classes differently. By denying public employment to those who have moved to Hawaii within the previous year, the statute serves to penalize those residents who have recently exercised their constitutional right to travel interstate. The plaintiffs maintain that this treatment is supported by neither a compelling state interest nor a rational basis. Furthermore, they argue that the stated legislative purpose of the law is constitutionally impermissible.

A. *The Scope of Judicial Review.*

■ Without a doubt, the durational residency statute does implicate interests protected by the right to travel. Although this right has never been ascribed to a particular section of the Constitution, its existence has long been recognized. In *United States v. Guest,* 383 U.S. 745, 757–58, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), the Supreme Court explained that:

> . . . [t]he constitutional right to travel from one State to another . . occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized. . . .
>
> . . . [This] right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the be-

ginning to be a necessary concomitant of the stronger Union the Constitution created. . . .

All statutes which set forth qualifications for public employment have the effect of creating two classes of people: those who qualify and those who do not. Nevertheless, given the importance of the constitutional right to travel, the question for this Court is whether to sustain the classification at issue here on the basis of a rational relationship between the statute and a valid legislative goal or whether to require the classification to undergo strict judicial scrutiny, *i. e.,* establish that the statute is necessary to promote a compelling state interest before it can pass constitutional muster.

The Supreme Court has never had the opportunity to decide whether or not a durational residency requirement for public employment must pass the "strict scrutiny" test.[15] It has, however, analyzed durational residency statutes in the context of other governmental benefits and services. In *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the Court struck down a one-year durational residency requirement for the receipt of welfare benefits. The Court held that in moving from state to state the welfare applicants "were exercising a constitutional right, and any classification which serves to penalize the exercise of that right, unless shown to be necessary to promote a *compelling* state interest, is unconstitutional." 394 U.S. 634, 89 S.Ct. 1331 (emphasis in original). It then found that all of the interests proffered in support of the rule, including fiscal integrity, planning, and the prevention of fraud, were not "compelling."

In the next relevant case, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Court invalidated a one-year

---

**15.** The defendant argues that *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), is controlling on this issue. *Murgia* held that there was no fundamental constitutional right to public employment. But that fact standing alone is irrelevant. There is no fundamental right to receive welfare, either. *See Jefferson v. Hackney,* 406 U.S. 535, 546–49, 92 S.Ct. 1724, 32

L.Ed.2d 285 (1972); *Dandridge v. Williams,* 397 U.S. 471, 483–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). Strict scrutiny was used in *Shapiro v. Thompson, infra,* because the welfare statute impacted upon the fundamental right to travel interstate. *Dandridge v. Williams, supra* at 484 n. 16, 90 S.Ct. 1153. The question here is whether or not Hawaii's statute also affects the right to travel in a significant way.

state durational residency requirement for voting. The compelling state interest test was invoked on alternative grounds: the statute both affected a fundamental right (voting) and penalized the recent exercise of the right to travel. The fact that there was no evidence that the statute actually did deter anyone from travelling from state to state was considered irrelevant. 405 U.S. 339–42, 92 S.Ct. 995. The challenged law still prevented those who had recently travelled from exercising their right to vote. That was held sufficient to require strict judicial scrutiny. The Court then found that the State's interests in preventing voting fraud and determining bona fide residence were not compelling given alternative means at the State's disposal to achieve these goals.

In 1974, the Court refined the principles expressed in *Shapiro* and *Dunn* when it invalidated a statute which provided that resident indigents could not receive free non-emergency medical care unless they had been residents for over a year. *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). In *Maricopa,* the Court recognized that not all durational residency requirements should be evaluated through strict scrutiny.[16] Rather, in order to determine whether the compelling state interest test should be invoked, a court must analyze the extent of a law's impact on interstate travel by considering (1) whether the waiting period would deter migration and (2) the extent to which it penalizes those who nevertheless choose to travel. 415 U.S. 256–62, 94 S.Ct. 1076. The Court found that a potential migrant might well consider the lack of free medical care and decide not to move into the state. More importantly, it held that non-emergency medical care was as much a "necessity of life" as welfare assistance. *Id.* at 259, 94 S.Ct. 1076. Hence, the withholding of this necessity from people

solely because they had recently exercised their right to travel was a sufficient penalty to justify the strict scrutiny test. The Court found that the interests promoted by the statute were either impermissible or not compelling.

Finally, in *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975), the Court sustained a one-year state residency requirement for the filing of a petition for divorce. The decision simply does not say whether the Court rejected the equal protection attack because it found a compelling state interest or whether it decided that the traditional rationality test would govern the result. Despite the dissent's objection, 419 U.S. 393, 418–19, 95 S.Ct. 553 (Marshall, J., dissenting), the Court did not explicitly determine whether it should use strict scrutiny by considering the statute's impact on interstate travel either through deterrence or as a penalty, as it had suggested in *Maricopa.* It merely stated that the divorce statute was "of a different stripe" since the statute promoted more than budgetary and recordkeeping goals and since the plaintiff was not irretrievably foreclosed from getting what she wanted (a divorce). She would qualify for one within a year. Apparently, the Court meant to distinguish the denial of welfare, voting, or medical care for one year as irretrievable. *See* 419 U.S. 406, 95 S.Ct. 553. Regardless of which Equal Protection test was used, the Court accepted two justifications for the statute: (1) the importance of regulating divorce for all parties concerned, not merely the state and the newly resident petitioner, and (2) the prevention of collateral attack of the state's divorce decrees in the courts of other states. *Id.* at 406–09, 95 S.Ct. 553.

It is against the background of *Shapiro, Dunn, Maricopa,* and *Sosna* that I must decide whether to apply strict scrutiny to Hawaii's public employment statute. After *Sosna,* the use of strict scrutiny cannot be

---

**16.** Although the Court has never squarely held so, it has hinted through dicta and summary affirmances that a one-year durational residency requirement to qualify for in-state tuition at a state college or university does not have to meet the compelling state interest test. *See, e.*

*g., Sosna v. Iowa, infra,* 419 U.S. at 409, 95 S.Ct. 553; *Vlandis v. Kline,* 412 U.S. 441, 452–53 n. 9, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973); *Starns v. Malkerson,* 326 F.Supp. 234 (D.Minn. 1970) (three-judge court), *aff'd mem.,* 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971).

viewed as automatic. Since the State maintains that the purpose of the statute is to control growth, protect the environment, and apportion employment opportunities, more than budgetary and recordkeeping goals are at issue.

A number of state and lower federal courts have struggled with the question of strict scrutiny and durational residency requirements or similar practices in the context of public employment. In *Eggert v. City of Seattle,* 81 Wash.2d 840, 505 P.2d 801 (1973), the Washington Supreme Court held that strict judicial scrutiny was required in order to test a one-year durational residency requirement for municipal employment. Similarly, in *State v. Wylie,* 516 P.2d 142 (Alaska 1973), the Alaska Supreme Court faced not a "requirement" but an absolute preference in public hiring for one-year residents over more recently arriving residents. The court chose to apply the strict scrutiny test. The Alaska Supreme Court has basically reaffirmed this decision, despite the intervention of *Sosna. See Hicklin v. Orbeck,* 565 P.2d 159, 162–66 (Alaska 1977), *appeal granted,* —— U.S. ——, 98 S.Ct. 391, 54 L.Ed.2d 275 (filed Oct. 31, 1977) (state law imposing durational hiring preference in oil and gas industries if the employer has a contract with the state, held failed to pass strict scrutiny test).[17] *Cf. Carter v. Gallagher,* 337 F.Supp. 626 (D.Minn.1971) (durational residency requirement to obtain veteran's preference in state employment must withstand strict scrutiny); *but cf. Town of Milton v. Civil Service Comm'n,* 365 Mass. 368, 312 N.E.2d 188 (1974) (durational residency preference for police hiring not a penalty on interstate travel and, hence, no strict scrutiny applied). The majority view appears to be that the strict scrutiny test should be employed.

In my opinion, the denial of the opportunity to apply for public employment does have a sufficient enough impact upon the right to travel to require that the statute be justified by a compelling state interest. At the hearing on the motion for a preliminary injunction, Robert Schmitt, a state statistician called by the defendant, testified that approximately 12% of the jobs available in Hawaii are with the State and local government.[18] There is no question in my mind that the forced inability of a new resident to apply for 12% of the available jobs is a penalty, particularly for those people who are generally trained for work performed primarily by government. Even though private jobs are still available, the universe of potential jobs is smaller. *See Maricopa, supra,* 415 U.S. at 264–65, 94 S.Ct. 1076, where the Court applied strict scrutiny even though it recognized that newly arrived indigent might still receive private medical care. With the exception of those with inherited wealth or those who are on the public dole, employment is the only way for people to provide themselves with the "necessities of life." Thus, this case is governed by *Shapiro* and *Maricopa. Sosna,* whatever the ultimate scope of its holding, is distinguishable in the sense that it dealt with non-economic matters which were not directly related to keeping people at or above the subsistence level. Thus, I find that Hawaii's durational residency statute classifies new residents in such a way as to operate as a penalty for the recent exercise of a fundamental constitutional right. In order to validate the statute, the defendant must prove that it is necessary to achieve a purpose which is both compelling and permissible.

---

**17.** The Supreme Court may decide this issue in *Hicklin v. Orbeck, supra.* Although the Alaska Supreme Court struck down the durational residency aspect of the hiring preference law for the oil and gas industry, it upheld the aspect of the law requiring the hiring of residents against an attack under the Privileges and Immunities Clause. The United States Supreme Court has agreed to hear an appeal directed to this latter issue. —— U.S. ——, 98 S.Ct. 391, 54 L.Ed.2d 275 (1977). If the state in turn questions the ruling on the durational aspect of the case, and if the Court agrees to hear that issue, one could expect a fairly definitive expression of the Court's view concerning equal protection and durational residency requirements for employment, private or otherwise.

**18.** Transcript of Proceedings, August 25, 26, and 29, 1977, at 86 [hereinafter cited as Transcript].

B. *The State's Justifications.*

The defendant offers two justifications for the durational residency statute. First, the State seeks to control growth and protect Hawaii's unique island environment by restricting the number of people migrating to the state. It also seeks to apportion employment opportunities and other resources so that long-term residents of the state will obtain jobs in preference to "outsiders." [19]

In support of the assertion that the statute is part of a complex program which is necessary to protect Hawaii's unique environment, the defendant called a number of witnesses. Robert Schmitt, a state statistician, detailed the trends in population growth and the cost of living in Hawaii. Interestingly, he stated that the number of persons born in Hawaii but living elsewhere in the United States was almost equal to the number of persons born elsewhere but living in Hawaii. George Ikeda, Executive Secretary to the State Commissioner on Manpower and Equal Employment, testified as to the potential for job growth in the labor force in the future. However, Mr. Ikeda stated that no survey had yet been made as to the number of one-year-or-less residents employed by the state and local governments.[20] Harry Akagi, an environmental planning coordinator for the State, testified as to the capacity of Oahu's water supply. He predicted that given current trends the traditional water supplies on Oahu would begin to be consumed faster than they were replaced by 1995. Mr. Akagi further testified that his department never made any study of the effect that the durational residency statute would have on water consumption.[21] Frank Skrivanek, Deputy Director of the Department of Planning and Economic Development, testified that although population trends were an important factor in planning for the future, his department had not studied the effect of the residency statute on population growth.[22]

I accept the proposition that Hawaii in general and the island of Oahu in particular will face substantial problems in coping with growth in the future. Nevertheless, while certain governmental solutions may be an "effective" answer to a problem in the narrowest sense of the term, they are not necessarily permissible in a federal system. The central Constitutional objection to the approach proposed by the defendant is that the state seeks to achieve its goal by keeping people out of Hawaii. Indeed, the defendant admits that this is the purpose of the statute. If people migrate to Hawaii despite the residency requirement then they will continue to use more water and take up space. In other words, the durational residency statute is an attempt to establish an interstate immigration policy. The Supreme Court has repeatedly stated that "to the extent the purpose of [such a law] is to inhibit the immigration of [people] generally, that goal is constitutionally impermissible." *Maricopa, supra* at 263–64, 94 S.Ct. at 1085; *Shapiro, supra,* 394 U.S. at 629, 89 S.Ct. 1322. This is not to say that the State is powerless to attack the problems it faces. It can constitutionally seek to control growth through the use of zoning and other, more enlightened tools of economic planning. *Cf. Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) (restriction of land use to one-family dwellings upheld).

Furthermore, even if the anti-migratory purpose of the statute was permissible, the defendant did not show that the classification of new and old residents of the state was even rationally related to protection of the environment. None of the witnesses called by the state could testify as to any significant connection between the number of people moving into Hawaii who were planning to or would take public jobs and the environmental problems faced by the state. Indeed, they had not even studied this problem. No one could even inform

---

**19.** See note 24, *infra.*

**20.** Transcript at 99.

**21.** Transcript at 114.

**22.** Transcript at 134.

the court as to the present number of public employees who had been residents of Hawaii for less than a year! Thus, as far as environmental protection goes, this statute does not even meet the traditional rational basis test of equal protection analysis.[23]

The defendant also briefly argued a second justification for the residency statute. The state seeks to provide its limited employment opportunities to its long-term residents in preference to better qualified outsiders who may be more able to go elsewhere and look for jobs.[24] Even assuming that this is a permissible legislative objective, the statute at issue here is clearly not tailored to perform this function. Furthermore, as noted above, the defendant could not even introduce evidence as to the number of present public employees who had been residents for less than a year. As the record stands now, this justification cannot even withstand the more limited scrutiny of the rational basis test.

C. *Conclusion.*

■ I therefore hold that the durational residency aspect of Haw.Rev.Stat. section 78–1(b) violates the Equal Protection Clause of the Fourteenth Amendment. The defendant has failed to establish a compelling state interest, or indeed, even a rational basis for this statute.

I further find that the plaintiff has met the requirements for a preliminary injunction. *See Aguirre v. Chula Vista Sanitary Service and Sani-tainer, Inc.,* 542 F.2d 779 (9th Cir. 1976). When a plaintiff's fundamental constitutional rights are being infringed upon, one can assume that irreparable injury exists.

The order denying the Motion to Abstain and granting appropriate declaratory and injunctive relief was issued for the reasons set forth above.

---

**23.** Counsel for defendant stated that a study was being instituted immediately to determine the dimensions of the supposed "problem" which the statute "corrects".

**24.** The defendant took this position at oral argument. Transcript at 155–56. In *York v. State, supra,* the State argued that a three-year residency requirement for public employment

guaranteed that only "qualified" people would be hired. The Hawaii Supreme Court found this irrational and struck down the statute under the traditional equal protection test. See note 3, *supra.* Now the State argues that the statute seeks to protect the less-qualified person!